UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
06-CV-2860(JMR/FLN)


Michael Thomas, Brian      )
Conover, and Frederick Newell )
                           )
        v.                 )      ORDER
                           )
City of Saint Paul         )


     This matter is before the Court on defendant's motion for
summary judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("Fed. R. Civ. P.").   Plaintiffs, African-American
business owners, claim defendant, City of Saint Paul, discriminated
against them in awarding publicly-funded contracts.   All parties
agree plaintiffs are African-American, and defendant is a duly
organized Minnesota city.   For the reasons set forth herein,
defendant's motion for summary judgment is granted.

I.   Background[1]

     A.   The Parties

     Defendant, City of St. Paul ("the City"), has adopted a Vendor
Outreach Program ("VOP") designed to assist minority and other
small business owners in competing for City contracts.   Plaintiffs,
at all relevant times, were VOP-certified minority business owners.
Each contends the City engaged in racially discriminatory illegal
conduct when awarding contracts for publicly-funded projects.

     1.   Michael Thomas

     Plaintiff Michael Thomas owns Cornerstone Community Realty &

---

[1]Because this is a motion for summary judgment, the facts are
taken in the light most favorable to plaintiffs.

Mortgage Services.  According to the complaint, his business is one of the City's few – if not the only – African-American owned, certified minority real estate disposition service.  He contends the City consistently denied him opportunities to work on publicly-funded projects because of his race.  As evidence of his claim, he cites (1) the City's failure to invite him to bid on projects related to the "Housing 5000 initiative";[2] (2) the City's failure to award him contracts for the same; and (3) the fact that independent developers have not contracted with his company.

The City contends Thomas was provided opportunities to bid for City work, pointing to an occasion when he was part of a team of qualified builders and developers who entered a competitive bid for the "Phalen Village Project."  Ultimately, Thomas's bid was rejected, and the contract was awarded to a Caucasian-owned business.

On another occasion, Thomas bid on, and the City was set to award him, a contract to market certain housing units for $40,000.

The City, however, in an attempt to broaden the contract awards to more VOP-covered businesses, divided the project into

---

[2]Thomas's allegations concerning the Housing 5000 projects are problematic.  Housing 5000 is a project of the Saint Paul Housing and Redevelopment Authority ("HRA"), not defendant.  As an independent government agency, it is neither an arm nor an alter-ego of the City of St. Paul.  Thus, it is the HRA which rejected the team's bid.

separate contracts, each set at $10,000. The City's terms also required VOP contractors to obtain insurance, accept payment on a reimbursement basis (up to 90 days), and accept payment of the contract over a period of 12 months. Thomas declined the work, because "the terms of this contract simply did not make good business sense" for him.

2. <u>Brian Conover</u>

Plaintiff Brian Conover owns Abel Trucking. Conover claims he submitted subcontracting bids to provide trucking services on 22 projects to various independent developers.[3] None of the bids were accepted.

According to Conover, the independent developers awarded each subcontract to Caucasians, whose bids were no more competitive than his. Notwithstanding this contention, and after years of discovery, he offers no admissible evidence to support his claim. He has not identified the subcontractors whose bids were accepted,

_____

[3]In 2004, Conover submitted bids on at least 22 different projects, including: (a) St. Paul Site F Demo Phase 1 & 2, A-23783-3; (b) St. Paul Highway 5, A-23847-3; (c) Upper Landing Park, A-23978-31; (d) Roselawns, A-24016-3 e; (e) Phalen Park Pathway, A-24103-3; (f) Riverview Busyway, A-24102-3; (g) St. Paul Library Outreach; (h) Paul Wellstone Center; (I) St. Paul River Bluff Village, A-241733; (j) St. Paul McDonough Phase II, 04096; (k) University and Dale Red, A-24262-3; (l) Elmcrest Park Utility and Street, 04-20; (m) McCarron's Campus Road, A-23965-3; (n) South St. Paul Street Reconstruction, 2004-001D; (o) Phalen Blvd Phase II, A-23955-3; (p) St. Paul Kellogg Blvd, A-23974-3; (q) West St. Paul Street Reconstruction, 041; ® St. Paul major sewer repairs, A-24016-3; (s) St. Paul Water Service, A-23961-1; (t) North St. Paul Charles St. & Centennial Drive, 6211-82; (u) Ruth Residential Paving, A-24089-3; and (v) North St. Paul, 04-01.

nor has he offered any comparison showing the accepted bid and the bid he submitted.

Conover also complains that, on other occasions, he received bidding invitations only a day before the bid was due. He maintains this practice created a barrier to competitive bidding, because it did not allow him adequate time to prepare a fairly competitive bid for the project. Once again, however, he fails to identify even one particular project to which he had only a single day to bid, and does not identify any person, of any race or background, similarly situated, who was afforded a longer period of time in which to submit a bid.

As proof of discrimination, he simply offers the independent developers' refusal to use his company; their failure to offer him any justification for their decision; and the City's failure to enforce the VOP.

### 3. Frederick Newell

Plaintiff Frederick Newell owns Newell Abatement Services, Inc.; Lead Investigative Services, Inc.; and Nails Construction Company. He claims he submitted numerous bids on the City's open competition projects, all of which were rejected.

Thereafter, he repeatedly contacted various Housing and Redevelopment Authority ("HRA") officials and Department of Planning and Economic Development ("PED") officials to complain that he did not get these jobs. Providing no specifics, he states

the PED "provided a variety of excuses" about why he did not receive the work. As evidence of discrimination, Newell cites the HRA's and the PED's failure to provide adequate explanations for his rejected bids, and their failure to liberally construe the mandates of the VOP in order to further the objective of providing economic opportunities to VOP-protected entities.

    B. <u>The VOP</u>

        1. <u>Sec. 84.01. Declaration of Policy and Purpose</u>

    In the mid-1990s, two studies - but no judicial decision - found indications that the City of St. Paul, Minnesota, discriminated against women and minorities in its contracting programs. The City attempted to remedy this discrimination and prevent it in the future by creating the VOP. The program was designed to assist contractors providing goods and services to the City with access to its publicly-funded projects.

    The City adopted a policy to "promote increased participation by qualified, minority-owned, women-owned, and economically disadvantaged small businesses in public contracting that is comparable to their availability in the Saint Paul marketplace." (City of St. Paul, Minn., Administrative Code ch. 84.)

    Under the VOP, the City sets annual benchmarks or levels of participation for the targeted groups. At the same time, the VOP expressly prohibits quotas. VOP benchmark levels are established, and participation of eligible businesses is reviewed every three

years in an effort to ensure (1) that the program seeks no more than to remedy the effects of past discrimination and prevent future discrimination, and becomes neither a quota program, nor cap participation of qualified businesses. The VOP's provisions apply to all contracts entered into or awarded, including prime and vendor contracts. Importantly, however, the VOP program applies only to the City of St. Paul; it does not refer to, or bind, any other governmental agency.

### 2.  Sec. 84.08.  Prime Contract Requirements

The VOP imposes various "good faith" requirements on prime contractors who bid for City projects. In particular, § 84.08 requires, among other things, that when a prime contractor rejects a bid from a VOP-certified business, the contractor must give the City its complete basis for the rejection, and evidence that the rejection was justified.

### 3.  Sec. 84.09.  Vendor Contract Requirements

The VOP further imposes obligations on the City with respect to vendor contracts. The City's contract manager must seek, where possible and lawful, to award a portion of vendor contracts to VOP-certified businesses. The contract manager must solicit these bids by phone, advertisement in a local paper, or other means prior to opening bid. Where applicable, the contract manager may assist interested VOP participants in obtaining bonds, lines of credit, or insurance required to perform under the contract. The VOP,

however, recognizes that these obligations must be performed in a manner consistent with other laws relating to competitive bidding and awards of contracts to the lowest bidder.

The contract manager also documents for the City those VOP bids which are rejected, including the complete basis for the rejection and evidence that the rejection was justified. (City of St. Paul, Minn., Administrative Code ch. 84.)  The VOP does not require the City to provide these reports to the public or disappointed bidders.  The VOP ordinance provides that when the contract manager engages in "one or more" of the above possible outreach efforts, he or she is in compliance with the mandates of the ordinance.  Id.

    4.  Sec. 84.10.  Monitoring and Reporting

The VOP ordinance requires monitoring and reporting, under which city officials are authorized to conduct reasonable inspections in order to verify a business owner's continued eligibility.  VOP participants must permit access to any relevant records.  In turn, the City's participating departments must prepare and submit reports to the mayor and city council regarding the annual levels of participation and other information gathered about the VOP.  The ordinance contains no provision requiring the City to give either its documentation or contractor reports to rejected VOP bidders.

    C.  Other Legally Distinct Entities and Programs

The HRA is a legally distinct public entity which undertakes

7

housing, commercial, and business development activities.  Minn. Stat. Ann. §§ 469.001 - 469.047 (2007).   It is authorized to acquire real estate, housing and commercial loans and grants, and issue certain bonds.  Nearly all the activities of the City's PED are authorized by the HRA.  The PED Director is the Executive Director of the HRA -- its sole employee, and the City Council serves as the HRA Board of Commissioners.

II.  <u>Analysis</u>

Plaintiffs contend the City discriminated against them on the basis of their race.  They further claim the City's failure to enforce the VOP violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Minnesota Human Rights Act, Chapter 363A.17.  The City seeks summary judgment.  The Court finds the City is entitled to summary judgment because plaintiffs lack standing to bring these claims and no genuine issues of material fact remain.

A.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby,</u>

Inc., 477 U.S. 242, 246 (1986).   The party opposing summary
judgment may not rest upon the allegations in its pleadings, but
must produce significant probative evidence demonstrating a genuine
issue for trial.   See Anderson, 477 U.S. at 248-49; see also
Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992).   "[T]he
mere existence of some alleged factual dispute between the parties
will not defeat an otherwise properly supported motion for summary
judgment; the requirement is that there be no genuine issue of
material fact."   Anderson, 477 U.S. at 247-48 (emphasis omitted).

   B.   Standing

   The burden of establishing Article III standing always lies
with the party invoking federal jurisdiction.   See Warth v. Seldin,
422 U.S. 490, 498 (1975).   To sustain this burden, plaintiffs must
prove a "personal injury fairly traceable to the defendant's
allegedly unlawful conduct and likely to be redressed by the
requested relief."   Dep't of Commerce v. United States House of
Representatives, 525 U.S. 316, 329 (1999).   The "injury" required
in this type of equal protection case is the inability to compete
on an equal footing in the bidding process, not the loss of
contract.   Ne. Florida Chapter of the Associated Gen. Contractors
of America v. City of Jacksonville, 508 U.S. 656, 666 (1993).   To
establish standing, therefore, plaintiffs must demonstrate both
their ability and readiness to bid on contracts, and further, that
the City's discriminatory policy prevented them from doing so on an

equal basis.  Id.

The Court finds that, after years of trying,[4] plaintiffs are simply unable to show an Associated Gen. Contractors injury, and therefore lack standing to pursue this claim.  There is no question plaintiffs did not obtain contracts or subcontracts with the City. But they entirely fail to show they were deprived of an opportunity to compete, or that their inability to obtain even one contract resulted from an act of discrimination.  Further, they fail to show any instance in which their race was a determinant in the denial of any contract.  As a result, plaintiffs have failed to demonstrate defendant engaged in discriminatory conduct or policy which prevented them from competing.  Thus, they have no standing to raise their claims.

In the absence of any showing of intentional discrimination based on race, the mere fact that the City did not award any contracts to plaintiffs does not furnish the causal nexus necessary to establish standing.  The law does not require the City to voluntarily adopt aggressive race-based affirmative action programs in order to award specific groups publicly-funded contracts.  See

---

[4]This case is the second iteration of essentially the same lawsuit.  A thematically identical case, with many of the same plaintiffs, was previously filed as Thomas et al. v. City of St. Paul et al., Court File No. 04-CV-5101(JMR/FLN).  The case was pending for approximately 10 months.  Defendant made multiple efforts to dismiss that suit based on various procedural defects, as well as lack of standing.  In order to elide the many collateral defects in the prior filing, the Court allowed it to be dismissed and refiled.  The present matter is the refiled action.

generally, City of Richmond v. Croson, 488 U.S. 469 (1989).
Rather, the City must provide all eligible contractors an equal
opportunity to compete.  Because plaintiffs are unable to show they
were denied an opportunity to compete, no redressable harm exists.

Plaintiffs' remaining allegations do not present harms which
can be redressed here.  They complain that the City or its prime
contractors failed to give them an explanation for their rejected
bids.  But there is no provision of law requiring the City, its
officials, or general contractors to do so.  The VOP requires City
monitoring and recordkeeping of its VOP activities in order to
provide reports to St. Paul's mayor and city council.  It does not,
however, require any such notice to rejected bidders or interested
third parties.  Plaintiffs ask the Court to find the City's failure
to liberally construe and enforce the VOP to be the legal
equivalent of unlawful conduct.  The Court must decline this
invitation.

In order to find discrimination, the law requires the showing
of an illegal policy or an illegal act.  See Gratz v. Bollinger,
539 U.S. 244, 261 (2003).  Here, plaintiffs have failed to show a
violation of the VOP ordinance, or any illegal policy or action on
the part of the City.  Any alleged shortcomings in the City's VOP
efforts, even if true, are not justiciable issues.  Plaintiffs must
identify to the Court a discriminatory policy in effect.  For

11

example, even assuming the City failed to give Conover more than one day's notice to enter a bid, such a failure is not, per se, illegal. More importantly, Conover offers no evidence that anyone else of any other race received an earlier notice, or that he was given this allegedly tardy notice as a result of his race. Even if the City's VOP practices are not ideal, that does not make them unlawful. Therefore, the Court is without authority to penalize the City for such failed attempts.

Similarly, Conover may not have been hired as a subcontractor to work for prime contractors receiving City contracts. But these were independent developers, and the City is not required to defend the alleged bad acts of others. Consequently, plaintiffs lack standing for failing to show personal injury fairly traceable to the City's alleged unlawful conduct likely to be redressed by the requested relief.

Beyond this, plaintiffs have failed to recognize that they chose the City of St. Paul as the defendant in this case. In many of the instances where illegal action is claimed, the purportedly offending party is not the defendant. By way of example, Thomas complains of failure to receive contracts for Housing 5000 and certain independent developer projects. But he does not allege, let alone prove, that the City controls either. The HRA is legally distinct from the City and not under the City's control; therefore, any of its alleged wrongful acts cannot be imputed to the City of

12

St. Paul.

C. <u>Plaintiffs' Claims</u>

Even assuming plaintiffs possess standing, they fail to adduce material facts which demonstrate a need for trial on the merits for any of their claims. This is true primarily because each theory of recovery is viable only if the City intentionally treated plaintiffs unfavorably because of their race. <u>See</u> <u>Guardians Ass'n v. Civil Serv. Comm'n</u>, 463 U.S. 582 (1983); <u>Williams v. City of Sioux Falls</u>, 846 F.2d 509, 511 (8th Cir. 1988). The Court addresses each claim separately.

1. <u>Fourteenth Amendment Equal Protection Claim</u>

Plaintiffs claim the City intentionally deprived them of equal protection of the law on the basis of their race by failing to enforce the provisions of the VOP, in light of its knowledge that minority businesses have historically been subject to discrimination. Plaintiffs further contend the City's failure to enforce the VOP prevented them from obtaining city contracts in the same manner as Caucasian business owners. Their contentions fail.

To establish a prima facie violation of the equal protection clause on the basis of discrimination, there must be state action. To support the claim, plaintiffs must offer facts and evidence that constitute "[p]roof of racially discriminatory intent or purpose." <u>Village of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 265 (1977); <u>accord</u> <u>Foster v. Wyrick</u>, 823 F.2d 218, 221 (8th

Cir. 1987).  Here, plaintiffs have failed to allege any single instance showing the City intentionally rejected VOP bids based on their race.

Plaintiffs offer no evidence of a specific time when any one of them submitted the lowest bid for a contract or subcontract which might have entitled them to an award of the City's contract. Further, they offer no evidence showing any case where their bids were rejected on the basis of race.  The alleged failure to place minority contractors in a preferred position, without more, is simply insufficient to support a finding that the City failed to treat them equally based upon their race.  <u>City of Sioux Falls</u>, 846 F.2d at 512.

       1.  <u>Sec. 1981 Claim</u>

This failure to produce facts necessitating a trial on the merits applies equally to plaintiffs' § 1981 claim.  Racial discrimination in the making and enforcement of contracts is prohibited under 42 U.S.C. § 1981.  To establish a prima facie case under this statute plaintiffs must show that (1) they are members of a racial minority; (2) the City intended to discriminate against them on the basis of their race; and (3) the discrimination concerned a subject recited in § 1981.  <u>Williams v. Lindenwood Univ.</u>, 288 F.3d 349, 355 (8th Cir. 2002).  Plaintiffs, as African-Americans, are certainly members of a protected class.  But again, there is no need for a trial on the merits, because they fail to

establish the requisite prima facie case by adducing any facts showing the City intentionally rejected their bids due to race.

### 3.   42 U.S.C. § 2000d Claim

Plaintiffs' § 2000d claim is not dissimilar.  Section 2000d prohibits discrimination on the basis of race, color, or national origin in connection with a program or activity that receives federal financial assistance.  To establish the elements of a prima facie case under Title VI, plaintiffs must demonstrate that their race, color, or national origin motivated the City's discriminatory conduct.  Thomson by and through Buckhanon v. Bd. of Special School Dist. No. 1, 144 F.3d 574, 581 (8th Cir. 1998).

As noted, there is a paucity of evidence that the City intentionally discriminated against these plaintiffs.  After years of discovery, they offer no evidence suggesting the City's possible motive.  And, significantly, plaintiffs have not presented any evidence which shows even a slight connection between the City's bid rejections and plaintiffs' race, color, or national origin. Consequently, plaintiffs' 42 U.S.C. § 2000d claims fail as a matter of law.

### 4.   Sec. 1983 Claims

Plaintiffs' dependent § 1983 claims fall because they have not offered a single instance showing the City deprived them of their rights.  Section 1983 provides that, any person, who under color of state law deprives another individual of federally protected

15

rights, is subject to personal liability.  The statute, itself, creates no substantive rights; it simply provides remedies for deprivations of rights established elsewhere.  <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808 (1985).  Accordingly, plaintiffs do not present a viable claim under § 1983.  Absent a showing of an instance where plaintiffs' rights have been denied, no § 1983 action can be maintained.

### 5.  <u>Minnesota Human Rights Act Claim</u>

The Minnesota Human Rights Act ("MHRA") provides a cause of action when a party "discriminate[s] against any person in the access to, admission to, full utilization of, or benefit from any public service because of race. . . ."  Minn. Stat. § 363.A12 (2004).  Here again, a showing of the fact of discrimination is the <u>sine qua non</u>.  To maintain a discrimination case under the MHRA, a complainant must establish a prima facie case of discrimination.  <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981).  Plaintiffs must produce evidence of a discriminatory motive.  <u>Sigurdson v. Isanti County</u>, 386 N.W.2d 715, 720 (Minn. 1986).

Plaintiffs claim they were denied access to benefits by virtue of the City's rejection of their bids.  The City denies its actions constitute racial discrimination under the Act because plaintiffs were not treated differently from others similarly situated. The significant question for purposes of the Act, however,

16

CASE 0:06-cv-02860-JMR-FLN   Document 78   Filed 12/13/07   Page 17 of 17

is whether the City's actions were racially motivated. Plaintiffs have failed to show that they were.

III.  <u>Conclusion</u>

For the foregoing reasons, defendant's motion is granted.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 12, 2007

<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States Chief District Judge